COMMONWEALTH *vs.* I. CHARLES BAKER
(and a companion case).

Middlesex.   November 5, 1974. — June 6, 1975.

Present: TAURO, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Larceny. Pleading, Criminal,* Bill of particulars. *Practice, Criminal,* Venue, Ordering verdict, Charge to jury. *Error,* Whether error harmful. *Evidence,* Business record, Relevancy and materiality, Competency. *Statute,* Construction. *Words,* "Money," "Security."

Bail bonds are not instruments which may be described as "money" or "obligations or other securities for money" as referred to in G. L. c. 277, § 23, and at the trial of indictments charging that bond agents did steal "money" of surety companies on the bonds, where there was no evidence that the defendants received any premiums thereon, it was error not to allow their motions for directed verdicts at the close of the Commonwealth's case [64-71]; a verdict of not guilty should have been ordered with respect to such an indictment where there was evidence that the principal's mother paid a premium but the jury in finding the defendants guilty of larceny of the bond implicitly found that they did not steal the premium [71-72].

It was error to deny motions for particulars of bail bond agents to indictments for larceny in the statutory form alleging that between two stated dates the defendants did steal money of the surety company on the bonds, where a number of counts alleged commission of the larceny in the same time span as, or in a time span overlapping, time spans alleged in other counts; but since the motions were filed more than a year after the indictments and the defendants knew the basis of prosecution was the larceny of premiums and all the essential basic facts, the error was harmless beyond a reasonable doubt. [72-77]

The allowance of a petition by the Commonwealth under G. L. c. 277, § 57A, to proceed to trial on indictments for larceny of premiums on bail bonds against agents of the surety company in the county in which the bonds had been issued was supported by

statements of the prosecutor indicating receipt of premiums in that county by the defendants, although they made monthly accountings and paid premiums to the company in another county.  [78-80]

At a criminal trial, the judge cannot be required to grant a motion "that the Court direct a verdict of not guilty on the Commonwealth's opening."  [80-81]

Evidence warranted findings that, when initially receiving premiums on certain bail bonds from principals, two bond agents intended to keep the premiums and to deprive the surety companies of their share thereof, pursuant to a scheme to exclude the bonds from the agents' monthly reports, and that the agents were guilty of larceny under G. L. c. 266, § 30 [81]; G. L. c. 175, § 176, had no bearing on the propriety of the trial judge's denial of motions for directed verdicts [81-83].

At a criminal trial, the prosecutor was properly allowed reasonable leeway in the examination of Commonwealth witnesses who did not testify voluntarily or were not cooperative.  [83]

At a trial for larceny, evidence was adequate to support a preliminary finding of the judge that the conditions imposed by G. L. c. 233, § 78, for admission in evidence of certain business records had been satisfied.  [84]

At the trial of indictments for larceny of premiums on bail bonds against bond agents, testimony of Commonwealth witnesses that they had examined monthly reports to the surety companies by the defendants and had not found any of the bonds listed thereon did not usurp the jury's fact-finding function or constitute opinion testimony.  [84-85]

At the trial of indictments charging bail bond agents with larceny of premiums on twenty-two bail bonds written by them for surety companies but not shown on the agents' monthly reports, it was proper to admit in evidence many additional bail bonds which were omitted from their monthly reports for the sole purposes of negating "any mistake of a bookkeeping nature," and of showing the "intent" and "common scheme" of the defendants to defraud the companies.  [85-86]

INDICTMENTS found and returned in the Superior Court on October 4, 1971.

The cases were tried before Collins, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*John P. White, Jr.*, for Nathan A. Baker.

*Monroe L. Inker (Charlotte Anne Perretta* with him) for I. Charles Baker.

*Terence A. Troyer*, Assistant District Attorney *(Bonnie H. MacLeod-Griffin*, Assistant District Attorney, with him) for the Commonwealth.

QUIRICO, J. Each of the two defendants, I. Charles Baker and his brother Nathan A. Baker, was charged with twenty-two crimes of larceny of more than $100, each crime being charged in a separate count. The first four counts of each indictment alleged that the money stolen was the property of the Continental Casualty Company (Continental) and the remaining counts alleged that it was the property of the American Casualty Company (American). Each count alleged the crime to have been committed between two dates specified therein. The same set of dates appearing in a count of one indictment also appeared in the count bearing the same number in the other indictment.[1]

The two indictments were tried before a jury in a single trial under the provisions of G. L. c. 278, §§ 33A-

---

[1] The indictments alleged that the crimes charged in the several counts were committed between the following dates:

| Count No. | Between | Count No. | Between |
|---|---|---|---|
| 1* | 11-5-68 and 12-30-68 | 12 | 6-27-70 and 7-31-70 |
| 2* | 8-9-68 and 9-30-68 | 13 | 6-27-70 and 7-31-70 |
| 3* | 11-20-67 and 12-31-67 | 14 | 6-27-70 and 7-31-70 |
| 4* | 7-31-68 and 8-31-68 | 15 | 6-27-70 and 7-31-70 |
| 5 | 8-19-69 and 9-30-69 | 16 | 7-1-70 and 8-31-70 |
| 6 | 4-9-70 and 5-31-70 | 17 | 11-20-70 and 12-31-70 |
| 7 | 4-16-70 and 5-31-70 | 18 | 12-2-70 and 1-31-71 |
| 8 | 5-8-70 and 6-30-70 | 19 | 10-24-70 and 11-30-70 |
| 9 | 5-8-70 and 6-30-70 | 20 | 3-29-71 and 4-30-71 |
| 10 | 5-18-70 and 6-30-70 | 21 | 12-22-70 and 1-31-71 |
| 11 | 6-26-70 and 7-31-70 | 22 | 6-18-71 and 7-31-71 |

*(These numbered counts in each indictment alleged larceny of money belonging to Continental, and all other counts alleged larceny of money belonging to American.)

33G.  The defendants were found guilty and sentenced
on all counts.  They appealed to the Appeals Court and
the cases were then ordered transferred to this court.  See
G. L. c. 211A, § 10 (A), inserted by St. 1972, c. 740, § 1.

The defendants filed a consolidated assignment alleging
a total of twenty-seven errors, but in their joint brief they
have not argued all of them.  We therefore limit our
consideration to the issues argued and treat the rest as
waived.  S.J.C. Rule 1:13, 351 Mass. 738 (1967).  *Lolos*
v. *Berlin,* 338 Mass. 10, 13-14 (1958).  *Commonwealth*
v. *Martin,* 358 Mass. 282, 290 (1970).  *Gelinas* v. *New
England Power Co.* 359 Mass. 119, 127 (1971).  The
defendants argue that the trial judge committed errors in
(1) denying their motions for particulars, (2) refusing to
read the minutes of the grand jury who had returned the
indictments, (3) allowing the Commonwealth's petition
under G. L. c. 277, § 57A, concerning venue, (4) deny-
ing their motions for directed verdicts of not guilty made
at the close of the Commonwealth's opening statement
and repeated at the close of the Commonwealth's case,
(5) making various rulings relating to the examination of
witnesses and the admissibility of evidence, and (6)
refusing to give the jury certain instructions requested by
the defendants and giving the jury certain instructions
claimed to have been incorrect.  Before discussing these
alleged errors it may be helpful to summarize briefly
some of the evidence showing the setting in which these
cases arise.

At all times material to these cases Continental and
American were licensed to issue surety bail bonds (bail
bonds) in this Commonwealth.  Baker Brothers Insur-
ance Agency, Inc. (the agency), a Massachusetts corpora-
tion, became an agent for the issuance of bail bonds for
Continental in 1959, and for both Continental and
American on July 1, 1969.  All bail bonds issued by the
agency before the latter date were issued on behalf of
Continental, and all those issued after that date were
issued on behalf of American.  Each defendant owned

one-half of the outstanding shares of stock of the agency. Between 1959 and 1971 the defendant Nathan A. Baker was the president, and the defendant I. Charles Baker was the treasurer of the agency. In addition, they and one other person were the directors of the agency. The agency was duly licensed to issue bail bonds as agent for either Continental or American or both in this Commonwealth in the years in question.

The contracts between the agency and the surety companies required the agency to file with each company a monthly list of all bail bonds issued by the agency on behalf of the company, and to pay the premiums due to the company, less the commissions to which the agency was entitled. A typical monthly report listed several hundred bail bonds issued by the agency for the company, listing each bond by the name of the principal, the amount thereof, the gross and net premiums, and the date of issuance.

On various dates, the earliest being November 20, 1967, and the latest being June 18, 1971, the agency issued twenty-two bail bonds, the first four of these on behalf of Continental and the eighteen thereafter on behalf of American. None of these twenty-two bonds was included in any of the agency's monthly reports to either company, nor did the agency pay the company any part of the premium for any of these bonds issued in its name. The Commonwealth contends that each defendant committed larceny as to each of these twenty-two bonds, that each of the twenty-two counts in the indictment against one defendant alleges the crime of larceny with respect to a different one of the twenty-two bonds, and that the twenty-two count indictment against the other defendant alleges the same crimes with respect to the same bonds.

All counts are in substantially the same form. All allege that the named defendant, between two stated dates, at the county of Middlesex, "did steal *money*" (emphasis supplied) of the amount of more than $100,

the property of the named owner (Continental in four counts and of American in eighteen counts of each indictment). The counts are thus in substantially the statutory form authorized by G. L. c. 277, § 79,[2] with the addition of the date and place of the offense charged.

Each of the twenty-two bail bonds in question was signed either by one of the defendants or by an employee (subagent) of the agency, all of which persons were authorized to sign such bonds in behalf of the agency.

As to the bonds involved in the five counts numbered 10, 16, 17, 18 and 22 of each indictment, there was testimony that a premium was paid therefor, the premium for one having been paid directly to the defendant Nathan Baker and the premiums for the other four having been paid to one of the subagents, and there was further evidence permitting an inference that the subagents paid the premiums over to one of the defendants or to an employee of the agency.

As to the bonds involved in the remaining seventeen counts of each indictment the situation is as follows. As to count numbered 7 there was testimony by a witness that a premium was paid therefor to one of the subagents, and testimony by the latter that he had no memory of the transaction. As to the remaining sixteen counts numbered 1 through 6, 8, 9, 11 through 15, and 19 through 21, there was either (a) no testimony whether any premium was paid, (b) testimony that no premium was paid, or (c) testimony by a witness who had no memory whether a premium was paid.

The judge submitted all counts against both defendants to the jury for their verdicts. He instructed the jury that as to each count they could find the defendant

---

[2] Section 79 provides in part that the following forms "shall be sufficient" for complaints or indictments charging the crime of larceny under G. L. c. 266, § 30: "(1) That A. B. did steal one horse of the value of more (*or* less, as the case may be) than one hundred dollars, of the property of C. D. (2) That A. B. did steal six cows, each of the value of twenty dollars, of the property of C. D."

named therein not guilty, guilty of larceny of the bond involved, or guilty of larceny of the premium paid for the bond, and that if they found a defendant guilty on any count they must state whether he was found guilty of larceny of the bond or of the premium. The jury returned verdicts finding each defendant guilty on all counts against him. In the five counts numbered 10, 16, 17, 18 and 22, they found the defendants guilty of larceny of the premiums, and in the remaining seventeen counts numbered 1 through 9, 11 through 15, and 19 through 21, they found the defendants guilty of larceny of the bonds.

The judge imposed on each defendant a sentence on each count of one year in a house of correction and a fine of $100, the sentences to be served concurrently; and he stayed execution of the sentences and payment of the fines pending the outcome of the present appeals. There is no indication whether, in sentencing the defendants, the judge considered the applicability of G. L. c. 266, § 40, relating to the punishment of "a common and notorious thief."

For the reasons stated below, we affirm the judgments on the five counts numbered 10, 16, 17, 18 and 22 on which both defendants were found guilty of larceny of premiums, and we reverse the judgments on the seventeen counts numbered 1 through 9, 11 through 15, and 19 through 21 on which both defendants were found guilty of larceny of bonds.

## A. *Larceny of Bonds.*

The defendants made pre-trial motions for particulars by which they requested, inter alia, details concerning, "[t]he nature of the property described as money which the Defendant[s] . . . [are] alleged to have stolen." The Commonwealth objected to the allowance of the motion and it was denied. At all times before trial and at least through the prosecutor's opening statement to the jury, the Commonwealth's position seems to have been that it

would prove that the defendants had received premiums on the twenty-two bail bonds in question and that they had stolen the surety companies' shares of those premiums.

On the fifth day of the trial the Commonwealth offered one of these bonds as an exhibit without first having offered any evidence that the defendants had received a premium therefor. This precipitated a long bench conference in which the prosecutor contended (a) that by issuing the bond without receiving a premium the defendants stole from the surety company its right to receive a premium, and, either additionally or alternatively, (b) that the defendants, by filing with the surety companies a series of false monthly statements from which they had intentionally omitted many bonds issued, had, by that false pretense, been enabled to continue to pledge the credit or obligations of the companies as to bonds issued thereafter.

On the fifteenth day of the trial there was another bench conference on the same general subject. At the start of that conference the Commonwealth's position seemed to be that although the indictments charged larceny of "money," it was entitled to prove the defendants' guilt by showing that by means of some false pretense they had induced the surety companies "to part with property of any kind." The Commonwealth's position at the end of the conference seemed to be that by virtue of G. L. c. 277, § 23, the defendants could be found guilty of larceny of bail bonds on each of those sixteen counts where there was no proof that they had received any premiums for the bonds.

The Commonwealth rested its case late on the fifteenth day of trial. The next day was devoted almost entirely to arguments on the defendants' motions for directed verdicts of not guilty. A large part of the argument again revolved around the question whether the defendants could be found guilty of larceny of the bonds on those sixteen counts mentioned above.

Section 23 provides: "If an allegation relative to any bullion, money, notes, bank notes, checks, drafts, bills of exchange, obligations or other securities for money of any country, state, county, city, town, bank, corporation, partnership or person is necessary, it may describe it as money, without specifying any particulars thereof; and such descriptive allegation shall be sustained by proof of any amount of bullion, money, notes or other securities for money as aforesaid, although the particular nature thereof shall not be proved."

The question is whether a bail bond of the type involved here, in the standard form prescribed by G. L. c. 276, § 65, as amended by St. 1971, c. 473, § 2, signed by a person charged with or on appeal from conviction of a crime as principal and by either Continental or American as surety, is an instrument or document of the kinds which, by virtue of G. L. c. 277, § 23, quoted above, are included in, and may be described by, the single word "money" in an indictment. The judge in effect ruled that the word "money" as used in the indictments was sufficient to include a bail bond, as indicated by his statement in denying the motions for directed verdicts: "I am denying the motions for directed verdict on the sixteen counts, other than those [on] which there is evidence of direct payment. I may take any verdict of guilty under leave reserved. . . . I will instruct the jury on the theory that if they find no payment of premium was made on the sixteen counts that they may consider whether at the time the bond was filed the defendants with larcenous intent converted the bail bond to their own, to his or their own use." The judge did so instruct the jury as indicated by the portion of his charge which is reproduced in the margin.[3]

[3] "Therefore, if in respect to a particular count in the indictment the jury finds that it wasn't proved by the Commonwealth that the Agent collected a premium in respect of the bond in question, the only possibility of a guilty verdict on that count would be a conclusion by the jury beyond a reasonable doubt from all the evidence that

We hold that the judge's interpretation and application of G. L. c. 277, § 23, was incorrect. We do not believe that the language of the statute permits the word "money," as used in the indictments to describe the property allegedly stolen, to be construed to include bail bonds. We hasten to add that this is not a holding that printed bail bond forms, whether in blank or executed, cannot be the objects of the crime of larceny. It is a holding, however, that the language used in the indictments in these cases is not adequate to permit a jury to convict the defendants of the larceny of bail bonds.

The primary purpose of § 23 seems to be to provide that bullion, money, and certain types of instruments and documents evidencing an indebtedness or investment should be considered the equivalent of money and that

---

at the time the bond was issued or approximately at that time . . . the defendant never intended to report that bond to the company, and intended to convert that bond to his own use, or to the agency's own use, or to the use of both defendants, either by giving it away or by keeping any premium, if one was later collected. Thus there would be larceny of the bond which by the statutory definition of money in General Laws, Chapter 277, Section 23 pertaining to the use of that word in indictments would be referred to in the indictment as money, because it was 'a security for money' as that word is used in Section 23 of Chapter 277."

Later in his instructions, the judge stated: "[I]f the jury concludes that the Commonwealth has failed to present sufficient evidence to warrant a verdict of stealing of a premium, then is there any other theory upon which the jury could return a verdict of guilty on such counts? Well, the answer to that question depends, of course, on whether the . . . defendants are found by the jury to have had the criminal intent at or about the time the bond was issued to convert the bond, itself, to his or their or the agency's own use to the exclusion of the insurance companies' rights to know the bond's existence and to enjoy the right to receive or collect a premium. Such a conversion would constitute larceny of a bond itself, where there is such a conversion. Where criminal intent was found then the bond, itself, may be considered as money for the purposes of these indictments." He then cited and read in part the language of § 23, and continued: "I instruct you that a bail bond is 'security for money.' It is the security for the prisoner's appearance in court. But in the other aspects it is a security for money, for the payment of money on condition that he doesn't appear in court as required."

they may be described as such in a criminal complaint or indictment. The statute groups "bullion, money, notes, bank notes, checks, drafts, bills of exchange, obligations or other securities for money of any country, state, county, city, town, bank, corporation, partnership or person" as the articles which may come under the umbrella of the word "money." Clearly, bail bonds are not bullion, and apart from the statute they are not money. Neither are they notes, bank notes, checks, drafts or bills of exchange. The only statutory category which it is argued includes bail bonds is that of "obligations or other securities for money of any . . . corporation . . . or person." In some sense, of course, a bail bond is a combination of a personal and corporate obligation for money, although the obligation is conditional. On the other hand, a bail bond is obviously not a "security" as that term is commonly applied to the ordinary bond received by an investor as evidence of his investment. Is a bail bond nevertheless a "security" within the meaning of § 23? The parties have cited no judicial precedents on the interpretation of this particular portion of this particular statute, and our research has disclosed none.

In the absence of specific precedent on the meaning of a word or phrase in a statute, we are guided by accepted principles of construction. One such principle leads us to relate the words in question to the associated words and phrases in the statutory context. *Hodgerney* v. *Baker,* 324 Mass. 703, 706 (1949). Sands, Sutherland Statutory Construction, § 47.16 (4th ed. 1973). The words "notes, bank notes, checks, drafts [and] bills of exchange" generally suggest items with a certain character of negotiability or transferability deriving at least in part from an ability to be converted ultimately to "cash." Thus a "note" may be defined as "a written unconditional promise to pay another a certain sum of money at a certain time, or at a time which must certainly arrive." 11 Am. Jur. 2d, Bills and Notes, § 21 (1963). "Bank notes . . . are the promissory notes of a bank . . .. They

are intended to pass, and do pass, as money . . .." *Ibid.* Checks, drafts, and bills of exchange serve commercial functions similar to those served by notes, and are primarily distinguished from notes in that they involve an order to pay, usually on a third party, while notes involve a promise to pay. *Id.* §§ 14, 18, 22. Plainly, a bail bond, which merely assures that a penalty will be forfeited if an individual fails to appear in court as required, serves no commercial function similar to those outlined above.

In regard to whether a bail bond is a "security" within the meaning of § 23, we are urged by another principle of statutory construction to refer to definitions given the same word where it has appeared in other statutes under review. *Commonwealth* v. *Flynn,* 285 Mass. 136, 139-140 (1934). *Davis* v. *School Comm. of Somerville,* 307 Mass. 354, 361 (1940). *Webster* v. *Board of Appeals of Reading,* 349 Mass. 17, 19 (1965). Sands, Sutherland Statutory Construction, § 51.02 (4th ed. 1973). In line with this reasoning, it is instructive to examine the definition given "security" by the Uniform Commercial Code — Investment Securities: "In this Article unless the context otherwise requires (a) A 'security' is an instrument which (i) is issued in bearer or registered form; and (ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and (iii) is either one of a class or series or by its terms is divisible into a class or series of instruments; and (iv) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer." G. L. c. 106, § 8-102 (1), as appearing in St. 1963, c. 188, § 14. This definition conveys the idea that securities, like notes, bank notes, checks, drafts and bills of exchange are salable and transferable in some recognized, although perhaps limited, commercial market. It can be said that securities are generally negotiable. G. L. c. 106, § 8-105 (1). *New England*

*Merchs. Natl. Bank* v. *Old Colony Trust Co.* 356 Mass. 612, 615 (1970). The word "security" denotes an investment in some private or public business enterprise. See G. L. c. 63, § 38B, as amended through St. 1973, c. 752, § 8. *Industrial Fin. Corp.* v. *State Tax Commn.* 367 Mass. 360, 365-367 (1975).

It is, of course, not particularly uncommon that "security" is explicitly defined to include a "bond." See, for example, the nearly identical definitions of "security" in the Uniform Securities Act, G. L. c. 110A, § 401 (k), the Securities Act of 1933, 15 U. S. C. § 77b (1) (1970), and the Securities Exchange Act of 1934, 15 U. S. C. § 78c (a) (10) (1970). But the "bonds" referred to in these statutes are not bail bonds, but the kinds of bonds which are investment vehicles in the ordinary commercial sense. Loss, Securities Regulation, 455 (2d ed. 1961). While the term "bond" in legal usage can refer both to a document evidencing a penal or indemnity obligation and to a document evidencing an investor's share in the obligation of a public or private entity, only the latter can logically be included within the definition of "security" as that term is ordinarily used. 12 Am. Jur. 2d, Bonds, §§ 1, 49 (1964). That is, the kind of bond which can be termed a security is a debt issue (as opposed to stock, which is an equity issue) of a public or private corporation or other entity. Henn, Corporations and other Business Enterprises, § 155 (2d ed. 1970). A bondholder in this sense is a creditor-investor in the entity in question. *Pettibone* v. *Toledo, Cincinnati, & St. Louis R.R.* 148 Mass. 411, 414-416 (1889). Thus, while the definition of "security" ought to be capable of encompassing "[n]ovel, uncommon, or irregular devices," *Securities & Exch. Commn.* v. *C. M. Joiner Leasing Corp.* 320 U. S. 344, 351 (1943), such devices are actually to be considered securities only "if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or

instrument commonly known as a security.'" *Ibid.* Bail bonds do not begin to meet these criteria. Although it is not always easy to distinguish securities from their close relatives, compare *Olpin* v. *Ideal Natl. Ins. Co.* 419 F. 2d 1250, 1259-1263 (10th Cir. 1969), cert. den. 397 U. S. 1074 (1970), with *Johns Hopkins Univ.* v. *Hutton,* 422 F. 2d 1124, 1126-1128 (4th Cir. 1970), we do not consider bail bonds to be even close relatives of securities. Bail bonds accordingly are not among the "obligations or other securities for money" referred to in G. L. c. 277, § 23.

We conclude, therefore, that it was error to submit to the jury for verdicts the sixteen counts numbered 1 through 6, 8, 9, 11 through 15, and 19 through 21, because (a) there was no evidence that the defendants received any premiums on the bail bonds involved in these counts, and (b) the defendants could not be found guilty of larceny of bail bonds on counts charging larceny of "money." The motions of both defendants for directed verdicts of not guilty on these sixteen counts at the close of the Commonwealth's case should have been allowed.

Count numbered 7 of each indictment presents a related problem. As to this count there was testimony by the mother of the principal on the bail bond that she paid a premium for the bond, but the subagent involved testified he had no memory of the matter. This count was properly submitted to the jury on the issue whether the defendants stole the premium. However, as described earlier in this opinion, the judge instructed the jury further that if they found that the defendants did not steal the premium they could consider whether they stole the bond. The jury returned a verdict on each count numbered 7 that the defendant was guilty of larceny of the bond. Implicit in the verdict was a finding by the jury that the defendant did not steal the premium. For the reasons stated above with reference to the group of sixteen counts, the verdict and sentence on

each count numbered 7 must be vacated, and a verdict of not guilty must be entered thereon as to each defendant.

## B. *Larceny of Premiums.*

The remainder of this opinion is limited to the five counts numbered 10, 16, 17, 18 and 22 on which the defendants were found guilty of larceny of premiums. We shall consider, as to these five counts only, various other issues raised by the defendants which have not been disposed of above.

1. *Denial of Motions for Particulars.* The indictments were returned by the grand jury on October 4, 1971. One defendant was arraigned on October 6 and the other on October 27, 1971. On November 16, 1971, each defendant filed five preliminary motions, including a motion to dismiss the larceny indictment for the reasons that it "is duplicitous, charges . . . more than one offense in a single count, charges . . . the same offense in different counts, has fragmented a single offense into many offenses, and is so vague and uncertain that it cannot be cured by a Bill of Particulars, and confounds the defendant in his defense." Neither defendant then filed a motion for particulars. All of the motions were heard on March 2, 1972, with the following result: on that date the motions to inspect documents were allowed and the ones to suppress evidence were deferred to the trial judge, and on April 3, 1972, the three other motions, including the motions to dismiss quoted above, were denied.

On June 8, 1972, when these cases were apparently reached or called for trial, they were marked, "Continued until September 1972, List at request of Defendant." On September 18, 1972, they were continued to November, 1972. It was not until October 12, 1972, that the defendants first filed their motions for particulars

on the indictments charging them with larceny.[4]   When
these motions were heard on November 6, 1972, the
Commonwealth objected to their allowance for the
reasons that (a) the defendants had already received con-
siderable discovery, including inspection of all the docu-
ments which the Commonwealth intended to offer in
evidence against them, and (b) the defendants had
delayed filing their motions for particulars until "this late
date before trial."   The defendants agreed that they had
been allowed to see or obtain copies of documents on
"what underlies the theory of the twenty-two counts"
against them and that they were ready for trial and
argued in justification of their delay in moving for
particulars that they had been pursuing other motions
which they hoped might have resulted in the dismissal of
the indictments.

By their motions for particulars the defendants sought
the following information as to each count: the date,
time of day and place the alleged crime was committed;
the means by which it was committed; the nature of the
property described as the money stolen; the nature of the
larceny (whether common law larceny, embezzlement or
larceny by false pretenses) charged; if the crime charged
was larceny by false pretenses, then the nature or content
of each communication constituting a false pretense, the
persons to whom they were made, and the time and
place at which they were made; the place at which and
the manner and form in which the defendant came into
possession of the property stolen; the place at which the
owner of the property was deprived of possession thereof;
the place where the defendant took the property allegedly

---

[4] Contemporaneously with the return of these indictments charging
larceny, the grand jury also returned indictments charging the
defendants with the crime of conspiracy in relation to the same
alleged larcenies.   The defendants had filed motions for particulars of
the alleged conspiracy shortly after the return of the indictments
charging that crime but did not then file such motions on the
indictments charging larceny.

stolen and the total value thereof. The motions were denied in their entirety. The defendants contend that the denial violated their constitutional right to due process of law and also their statutory rights under G. L. c. 277, § 40, dealing with particulars in criminal cases. For the reasons discussed below, we believe that they were entitled to some of the particulars which they requested, whether as matter of constitutional right or otherwise, but that the denial of their motions was harmless error.

The matters of the form and content of criminal complaints and indictments, and of requests for and allowance of particulars on such complaints and indictments, first became the subjects of general statutory regulation in this Commonwealth on the enactment of St. 1899, c. 409, entitled "An Act to provide for the simplification of criminal pleadings." These regulatory provisions now appear principally in G. L. c. 277.

General Laws c. 277, § 79, provides in part that "the forms hereto annexed, shall apply as well to complaints as to indictments, and . . . shall be sufficient in cases to which they are applicable." Included in the forms annexed to § 79 is one applicable to the crime of larceny. Each of the counts charging the defendant with the crime of larceny does so in the language of the statutory form, alleging that between two stated dates the defendant, in the county of Middlesex, did steal money of the amount of more than $100 of the property of the named owner (Continental in four counts and American in the other eighteen counts). The statutory form does not include any allegation of the date or place of the crime charged.

General Laws c. 277, § 40, provides in part: "The court *may*, upon arraignment of the defendant, or at any later stage of the proceedings, order the prosecution to file a statement of such particulars as may be necessary to give the defendant and the court reasonable knowledge of the nature and grounds of the crime charged, and if it has final jurisdiction of the crime, *shall* so order at the

request of the defendant if the charge would not be otherwise fully, plainly, substantially and formally set out" (emphasis supplied). We thus see that a court *must* allow certain motions for particulars "if the charge would not be otherwise fully, plainly, substantially and formally set out," and that in all other situations it *may*, in its discretion, order particulars. In commenting on G. L. c. 218, § 39, now G. L. c. 277, § 40, this court said in *Commonwealth* v. *King*, 202 Mass. 379, 384 (1909): "The first sentence of that section does give him [the defendant] an absolute right to require 'a statement of such particulars as may be necessary' to give him 'reasonable knowledge of the nature and grounds of the crime charged,' if that charge would not be otherwise 'fully, plainly, substantially and formally set out.' . . . Except as modified by this provision it still is, as it formerly was, in the discretion of the court to say whether any and what bill of particulars shall be furnished to him. . . . The change from 'shall' to 'may' in the statute cannot be treated as without significance, however either word might be construed if it stood alone." *Commonwealth* v. *McDonald*, 187 Mass. 581, 584-585 (1905). *Commonwealth* v. *Snell*, 189 Mass. 12, 19 (1905). *Commonwealth* v. *Jordan*, 207 Mass. 259, 266-267 (1911). *Commonwealth* v. *Kozlowsky*, 238 Mass. 379, 383 (1921). *Commonwealth* v. *Hayes*, 311 Mass. 21, 24-25 (1942). The same rule was again stated in *Commonwealth* v. *Welansky*, 316 Mass. 383, 395-396 (1944).

The discussion above brings us to the question whether the allegations in the indictments before us are such that the defendants were entitled to particulars as matter of right, or whether it was a matter of discretion whether the court would order or deny particulars.

There are some indications in our opinions to the effect that if a complaint or indictment is in the statutory form (G. L. c. 277, § 79), the defendant named therein is not entitled to particulars as matter of right, but only at the discretion of the court. In *Commonwealth* v. *Bloom-*

*berg,* 302 Mass. 349, 355 (1939), we said: "Indictments
. . . in the form prescribed by the statute, are expressly
deemed to be sufficient. . . . It is within the competency
of the General Court to establish forms of criminal
pleading and to provide that they shall be conceded suf-
ficient and valid." In *Commonwealth* v. *Norton,* 339
Mass. 592, 593 (1959), where the defendant alleged error
from the denial of his motion for particulars of the time,
place and manner and means of the alleged offense, we
said: "There was no error in the denial of this motion.
The indictment was in the form stated to be sufficient by
G. L. c. 277, § 79. . . . It was adequate to afford the
defendant reasonable knowledge of the nature and
grounds of the offence charged, and the furnishing of
further information in the form of particulars was within
the discretion of the judge." To the same effect, see
*Commonwealth* v. *Baron,* 356 Mass. 362, 364 (1969),
and *Commonwealth* v. *French,* 357 Mass. 356, 400
(1970), judgments vacated as to death penalty sub nom.
*Limone* v. *Massachusetts,* 408 U. S. 936 (1972). It is
arguable whether the cases cited and statements quoted
above are holdings that if a complaint or indictment is in
a form permitted by G. L. c. 277, § 79, the allowance of
a motion for particulars rests solely in the discretion of
the court. In any event, we do not rest our decision on
this theory and we therefore intimate no opinion thereon.

We hold that even if each count of the indictments
considered alone satisfied the requirement of art. 12 of
the Declaration of Rights of the Massachusetts Constitu-
tion that "[n]o subject shall be held to answer for any
crimes or offence, until the same is fully and plainly, sub-
stantially and formally, described to him," in the circum-
stances of these cases, particularly the fact that a number
of counts allege the crime of larceny to have been
committed in the same time span, or in a time span over-
lapping time spans in other counts (fn. 1, *supra*), the
defendants were entitled to some portions of the par-
ticulars requested and that the denial thereof was error.

Unlike the situation in the group of sixteen counts disposed of earlier in this opinion, however, the Commonwealth informed the defendants that on these five counts (numbered 10, 16, 17, 18 and 22) its basis of prosecution was that of larceny of premiums and it never changed that position. There had been considerable pre-trial discovery. The defendants knew at all times the essential basic facts, to be distinguished from evidence, which they might have obtained if the particulars had been ordered. The defendants were in no way prejudiced in their defence against these five counts by reason of the denial of their motions for particulars. Considering all the circumstances of these cases, we conclude that the judge's error in denying the motions, even if viewed as having constitutional dimensions, was harmless beyond a reasonable doubt. *Chapman* v. *California*, 386 U. S. 18, 21-26 (1967). *Harrington* v. *California*, 395 U. S. 250, 254 (1969). *Subilosky* v. *Commonwealth*, 358 Mass. 390, 397 (1970). *Commonwealth* v. *Gilday*, 367 Mass. 474, 499 (1975).

We take this occasion to make the following observations. The fact that a complaint or indictment is framed in the form permitted by G. L. c. 277, § 79, and will therefore withstand an attack as to its sufficiency (formerly by a motion to quash, now by a motion to dismiss under G. L. c. 277, § 47A, inserted by St. 1965, c. 617, § 1) is not decisive on the question whether the court should exercise its discretionary power to order particulars. A more liberal exercise of that discretion seems to be indicated when considering a conventional request for particulars of the time, place, nature and grounds of the crime charged when a felony is charged in an indictment framed in the limited language permitted by § 79. These observations are not to be construed as an invitation to defendants to request, or as a suggestion to judges that they order, particulars which, in their requirement for detail or otherwise, amount to the imposition of a straitjacket on the prosecution.

2. *Judge's Refusal to Read Grand Jury Minutes.* We have noted above that much of the argument on the motions for directed verdicts focused on the sixteen counts involving bail bonds as to which there had been no evidence that any premiums had been paid therefor. Because the prosecutor argued that, by virtue of G. L. c. 277, § 23, the word "money" could be construed to include bail bonds and that the jury could find the defendants guilty of larceny of bail bonds on these sixteen counts, the defendants requested that the judge read the minutes of the grand jury "to determine whether or not the defendants were, in fact, indicted for larceny of the premium . . . rather than larceny . . . of the bonds." The judge refused to do so, and the defendants argue that the refusal was error. Since we are reversing the judgments on these sixteen counts, we need not consider this issue further.

3. *Question of Venue.* The indictments in these cases were returned by a grand jury in Middlesex County. All of the bail bonds involved in the crimes charged in the indictments were issued by the agency in that county, and whatever premiums were paid by the purchasers for the bonds were paid in that county. The defendants filed motions to dismiss the indictments on the ground of improper venue. Attached to the motions was an affidavit to the effect that: the agency's place of business was in Boston, Suffolk County; all of the agency's contracts with, and accountings to, American and Continental on bail bond premiums were made in Suffolk County; all business transacted by the agency and the companies was transacted in Suffolk County; and all payments by the agency to the companies were transmitted to Boston or to places outside of the Commonwealth. The motions were heard on March 2, 1972, and denied on April 3, 1972. Their denial was not made the subject of any assignment of error and is not before us for review.

About two months before the trial started, the Commonwealth filed a petition, supported by affidavit, repre-

senting that it was in doubt whether the venue for the cases was properly in Middlesex County, and requesting that it be permitted to proceed with trial in that county pursuant to G. L. c. 277, § 57A.[5] The defendants objected, arguing that if any crime was committed it was embezzlement and that the embezzlement, if any, could have been committed only in Suffolk County because that is where the agency was required to make a monthly accounting and payment to the companies for premiums on bail bonds written. The judge allowed the petition by a written decision in which he said, in part, that the Commonwealth would be permitted to offer proof of any of three modes of larceny (common law larceny, larceny by false pretenses and embezzlement — see G. L. c. 266, § 30) under the indictment, that it should not be required at that stage to elect which form of larceny it intended to prove, that notwithstanding the requirement for monthly accounting and payment of premiums by the agency to the companies "[i]t is not hard to conceive of evidence which would permit a jury to conclude that the larcenous intent coupled with an act of appropriation concurred on some earlier date in Middlesex County," and that "[i]t should be open to the Commonwealth to show either that the premiums referred to in the Indictments were received by the Defendants here [in Middlesex County] as a result of their false and fraudulent representations, or that premiums received by them here were misappropriated to their own use here, or failing in proof of misappropriation here to show misappropriation in Suffolk

_____

[5] Section 57A reads: "A defendant shall not be discharged for want of jurisdiction if the evidence discloses that the crime with which he is charged was actually committed without the county or the territorial jurisdiction of the court in which he is being tried; provided, that the attorney general or the district attorney petitions to the court before proceeding with the trial for leave to proceed, stating that he is in doubt from the state of the evidence then in his possession as to whether or not the crime was committed within the county or the territorial jurisdiction of the court, and the court after hearing said petition orders the trial to proceed."

County.   There is sufficient nexus with Middlesex County
to support the Motion."

The judge's analysis of the situation in regard to venue
was correct.   The statements made by the prosecutor in
the affidavit filed with the petition and those made at the
hearing on the petition were sufficient to permit the
judge to find the facts necessary to support his action in
allowing the petition.   *Commonwealth* v. *Mannos,* 311
Mass. 94, 104 (1942).   *Commonwealth* v. *Stasiun,* 349
Mass. 38, 53-54 (1965).

4. *Denial of Motions for Directed Verdicts.*   Each
defendant argues that the judge committed error in deny-
ing his motion "that the Court direct a verdict of not
guilty on the Commonwealth's opening," and also in
denying his motion, filed at the close of the Common-
wealth's evidence, "that the Court direct a verdict of not
guilty on each and every count."

It was formerly the law that "[u]ntil all the evidence
has been closed on both sides, a defendant in a civil or
criminal case cannot require the judge to rule upon the
legal sufficiency of the evidence already introduced to
support a verdict against him."   *Commonwealth* v.
*Bader,* 285 Mass. 574, 575 (1934).   *Commonwealth* v.
*Carter,* 306 Mass. 141, 142 (1940).   However, as to
criminal cases, that law was changed by St. 1963, c. 569,
and also by St. 1964, c. 108, § 1, which resulted in the
following language now appearing in G. L. c. 278, § 11:
"The court on motion of a defendant or of its own
motion shall direct a verdict or enter a finding of not
guilty of any offense charged in an indictment *after the
evidence on either side is closed,* if the evidence is insuf-
ficient to sustain a conviction of such offense" (emphasis
supplied).

It must be noted that the statutory amendment
changed the former law only as to a motion for a directed
verdict "after the evidence on either side is closed."   As
to a motion made after the Commonwealth's opening,
the law remains unchanged and it is that "a judge cannot

be required to direct a verdict on an opening." *Commonwealth* v. *Hartford,* 346 Mass. 482, 489 (1963). *Commonwealth* v. *Binnette,* 351 Mass. 704 (1966). *Commonwealth* v. *van Kooiman,* 353 Mass. 759 (1967). *Commonwealth* v. *Sloane,* 361 Mass. 872 (1972). *Commonwealth* v. *Michel,* 367 Mass. 454, 463 (1975). We therefore do not deal with the alleged error in the denial of the motions for directed verdicts after the Commonwealth's opening.

We turn now to the motions for directed verdicts at the close of the Commonwealth's case. The sole question raised by these motions is "whether there was sufficient evidence of the defendant's guilt to warrant the submission of the cases to a jury." *Commonwealth* v. *Altenhaus,* 317 Mass. 270, 271 (1944). *Commonwealth* v. *Baron,* 356 Mass. 362, 365 (1969). We hold that there was. The evidence in its light most favorable to the Commonwealth was sufficient to permit the jury to find that the defendants, by concerted action extending over a period of years, stole bail bond premiums from both Continental and American by causing the agency to issue bonds with one of the companies as surety, then intentionally excluding a large number of those bonds (about 176 including the twenty-two involved in this case) from the agency's monthly reports to the companies, and personally keeping whatever premiums were received on these excluded bonds. The evidence also permitted the inference that by virtue of the scheme the larcenies in such cases occurred on the initial receipt of the premium with the concurrent intent to deprive the companies of their share thereof, rather than by reason of any subsequent embezzlement of premiums originally lawfully received. It would add nothing to our jurisprudence to describe the evidence in further detail.

One additional argument advanced by the defendants in support of their claim of error in the denial of their motions for directed verdicts requires attention. They argue that "if they were guilty of any criminal offense, it

was under G. L. c. 175, § 176," but that in any event the Commonwealth cannot prevail under that statute because it did not allege a crime thereunder and further it failed to show that Continental or American ever made a written demand for the premiums due them.[6]   There is no merit to this argument.

General Laws c. 175, § 176, neither creates a new or special crime of larceny of premiums by insurance agents or brokers, nor exempts such agents or brokers from prosecution under the general larceny statute, G. L. c. 266, § 30, if they steal premiums.   The statute does two things.   First it provides that insurance agents or brokers receiving certain types of premiums "shall be deemed to hold such premium[s] in trust for the company."   It then provides that if the agent or broker fails to pay such a premium, less permitted deductions, over to the company "after written demand made upon him therefor, . . . such failure shall be prima facie evidence that he has used or applied the said premium for a purpose other than paying the same over to the company, and upon conviction thereof he shall be guilty of larceny."   The latter provision means that if there is proof that an agent or broker received premiums of the kinds covered by the statute and that he failed to pay the premiums over to the insurance company after written demand therefor, such evidence, unexplained, is suf-

---

[6] Section 176 provides as follows:   "An insurance agent or broker who acts in negotiating or renewing or continuing a policy of insurance or an annuity or pure endowment contract issued by a company lawfully doing business in the commonwealth, and who receives any money or substitute for money as a premium for such a policy or contract from the insured or holder thereof, shall be deemed to hold such premium in trust for the company.   If he fails to pay the same over to the company after written demand made upon him therefor, less his commission and any deductions to which, by the written consent of the company, he may be entitled, such failure shall be prima facie evidence that he has used or applied the said premium for a purpose other than paying the same over to the company, and upon conviction thereof he shall be guilty of larceny."

ficient to support a conviction of larceny. It eliminates the necessity for proving what the accused agent or broker did with the money which he should have turned over to the company. However, it does not mean that even without such a demand on the agent or broker he cannot be convicted of larceny of premiums on proof of actual misappropriation. The statute has no bearing on the propriety of the judge's denial of the defendants' motions for directed verdicts.

Numerous additional arguments advanced on the issue of the motions for directed verdicts have been examined and found either not applicable or without merit.

5. *Evidentiary Rulings.* The defendants argue that the judge erred in several instances in admitting evidence over their objections and exceptions. We hold that he did not err, and we describe these instances briefly.

a. In attempting to prove that the defendants or their agency received premiums for the bail bonds involved in the sixteen counts on which we have ordered the entry of directed verdicts of not guilty, the Commonwealth called as witnesses three of the persons for whom the bonds were issued. It is obvious that they were not testifying voluntarily, or being cooperative when questioned about whether they had paid for their bonds. It was also obvious that they had done business with the defendants in connection with bail bonds on other occasions. The judge properly allowed the prosecutor reasonable leeway in the examination of these witnesses and did not exceed the bounds of permissible discretion. In any event, the testimony of the witnesses bore only on counts included in the group of sixteen mentioned above and no harm has come to the defendants.

b. As part of its attempt to prove that the defendants or their agency received premiums for bail bonds, the prosecution offered evidence, which the judge admitted, that in some cases the defendants took certain articles of jewelry or deeds to real estate as security for payment. This evidence did not relate to any of the five counts on

which we are affirming the judgments and we therefore need not discuss it.

c. The judge admitted in evidence certain business records which are admissible under G. L. c. 233, § 78, if the court makes the preliminary findings required thereby. The action of the judge in admitting the records in evidence imports a preliminary finding that the conditions imposed by § 78 had been satisfied. *Commonwealth* v. *Greenberg*, 339 Mass. 557, 578-579 (1959). *Commonwealth* v. *Monahan*, 349 Mass. 139, 170 (1965). *Commonwealth* v. *Leonard*, 352 Mass. 636, 644 (1967). The defendants claim that there was inadequate evidence to establish the statutory conditions precedent to the admission of the records, but their argument seems directed more to the weight and credibility of the evidence on which the preliminary finding was based rather than to its adequacy under the statute. We hold there was adequate evidence to support the preliminary finding. The decision on the weight and credibility of this evidence was a matter for the trial judge and his decision thereon is not reviewable on appeal.

d. The business records admitted in evidence included 176 bail bonds (including the twenty-two involved in the indictments) and ninety-four monthly reports by the agency to Continental and American purporting to list all bail bonds issued by the agency during each month covered. The judge allowed witnesses called by the Commonwealth to testify that they had examined all of the monthly reports and did not find the 176 bonds listed thereon. The defendants argue that this in some manner invaded or usurped the jury function as fact finders. We hold that it did not. Each monthly report listed several hundred bonds. In view of the complexities of the evidence in this area, the judge, in the exercise of his discretion, properly admitted the clarifying testimony in question. The jury were still free to examine the monthly reports themselves to see whether the bonds in question were included thereon. *Boston & Worcester R.R.*

v. *Dana,* 1 Gray 83, 104 (1854). *Commonwealth* v. *Greenberg,* 339 Mass. 557, 581-582 (1959). The claim by the defendants that the judge allowed the witnesses to state opinions is not correct. They were permitted to state, as a fact, whether the lists included the 176 bonds.

e. The indictments in these cases charged the defendants with larceny of money in connection with twenty-two bail bonds written by the agency for Continental and American. As noted above, at the trial the judge admitted in evidence not only those twenty-two bonds, but also 154 more, all of which were omitted from the monthly reports of the agency to the companies. The defendants argue that it was error to admit the 154 bonds which were not directly involved in the crimes charged by the indictments. In offering the 154 bonds the prosecutor said that he was doing it on the basis that as to the bail bonds involved in the indictments the evidence of these additional bonds "would negate any mistake of a bookkeeping error on behalf of either the company or the defendants . . . [and] to show as part of the case of the Commonwealth of the intent of the parties, the defendants, to defraud the companies and to show a common scheme on behalf of the defendants to defraud the insurance companies. It is for that sole purpose that they are being offered." We hold that these additional bonds were properly admitted for the purpose offered.

As a general rule, the fact that a defendant in a criminal case has committed another crime or crimes for which he is not now on trial cannot be shown as evidence tending to show the commission of the crime for which he is presently being tried. *Commonwealth* v. *Stone,* 321 Mass. 471, 473 (1947). Like most general rules, this rule is not without exceptions, including the one described in the following language of our opinion in the *Stone* case, *supra,* at 473-474: "In trials of indictments for larceny by obtaining money or property by false pretenses it has been held, as bearing on the defendant's intent, that his criminal conduct on another occasion

is admissible, provided it is reasonably near in time and so connected with the crime charged in the indictment as to show unity of plot and design and that it was part of a common plan or scheme to defraud." For cases applying this quoted exception see *Commonwealth v. Jeffries,* 7 Allen 548, 566-567 (1863); *Commonwealth v. Bennett,* 118 Mass. 443, 452-453 (1875); *Commonwealth v. Lubinsky,* 182 Mass. 142, 143 (1902); *Commonwealth v. Stuart,* 207 Mass. 563, 568-569 (1911); *Commonwealth v. Dow,* 217 Mass. 473, 480 (1914); *Commonwealth v. Farmer,* 218 Mass. 507, 512-513 (1914); and *Commonwealth v. Abbott Engr. Inc.* 351 Mass. 568, 573-574 (1967). For general discussions of the rule and its exceptions and applications, see Wigmore, Evidence, §§ 192-194, 300-302, 304 (3d ed. 1940); McCormick, Evidence, § 190 (2d ed. 1972). Rule 404 (b) of the new Federal Rules of Evidence, 28 U. S. C. App. (Supp. V, 1975) (as enacted by P. L. 93-595, January 2, 1975, effective July 1, 1975), provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

6. *Instructions to the Jury.* The greater part of the defendants' argument on alleged errors by the judge in instructing the jury deals with two issues which we have disposed of earlier in this opinion. The claim that the judge erroneously instructed the jury that they could find the defendants guilty of larceny of bonds has been decided by us in favor of the defendants on the seventeen counts numbered 1 through 9, 11 through 15, and 19 through 21, with the result that the error in instructing the jury on those counts need not be pursued further. The claim of error because the judge did not charge the jury on the effect of G. L. c. 175, § 176, has been decided by us against the defendants; and since we hold

that statute had no application to these cases it was not error for the judge to refuse to charge thereon.

The defendants claim errors in the charge in several other respects. We hold that, except with respect to the instruction permitting verdicts of guilty of larceny of bail bonds which we have discussed above, the charge when read and considered in its entirety was accurate and adequate.

## C. *Conclusion.*

Based on the foregoing, it is hereby ordered as follows: (a) the judgments on counts numbered 10, 16, 17, 18 and 22 against each defendant are affirmed; and (b) the judgments on counts numbered 1 through 9, 11 through 15, and 19 through 21 against each defendant are reversed, the verdicts thereon are set aside, and verdicts of not guilty are to be entered thereon.

*So ordered.*